IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ANTHONY TOCCI,

        Plaintiff,

    v.

ANTIOCH UNIVERSITY, et al.,

        Defendant.

:

:

:

:

Case No. 3:07-cv-314

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING MOTION OF DEFENDANTS
ANTIOCH UNIVERSITY AND THE MCGREGOR SCHOOL AT ANTIOCH
TO ENFORCE THE SETTLEMENT AND MOTION FOR SANCTIONS
INCLUDING ATTORNEY FEES AND COSTS (DOC. #50);
OVERRULING PLAINTIFF ANTHONY A. TOCCI'S MOTION FOR
RECONSIDERATION (DOC. #91); SAID DEFENDANTS ARE ORDERED
TO FILE, WITHIN THIRTY (30) DAYS, A MEMORANDUM
QUANTIFYING THE ATTORNEYS FEES AND COSTS INCURRED IN
CONNECTION WITH THE ENFORCEMENT OF THE SETTLEMENT
AGREEMENT; UPON THE FILING OF SAID MEMORANDUM, THE
COURT ORDERS THAT CERTAIN PREVIOUSLY SEALED DOCUMENTS
(Doc. #80) BE UNSEALED.

---

      After years of fruitless pursuit of a graduate degree, Plaintiff Anthony A.

Tocci ("Tocci") filed suit against Antioch University and The McGregor School of

Antioch University (hereinafter, "Antioch"), alleging breach of contract and

negligence claims.  Doc. #2.  After the Court issued two rulings (Doc. #30 and

Doc. #46) in response to Antioch's Motions for Summary Judgment (Doc. #19 and

Doc. #32), only Tocci's breach of contract claim remained to be tried.  On the eve

of trial, the Court ordered the parties into mediation. On July 12, 2010, the mediator reported to the Court that the parties had successfully resolved the case. Doc. #47. Accordingly, in an Order of Dismissal and Termination entered on July 13, 2010, the Court dismissed the action with prejudice. Doc. #48. In the Order of Dismissal, this Court expressly retained jurisdiction to enforce the terms of the parties' settlement agreement.[1] Doc. #48.

Two months later, on September 14, 2010, Antioch filed a Motion to Enforce the Settlement and Motion for Sanctions Including Attorney Fees and Costs ("Motion to Enforce"), which is now pending before the Court. Doc. #50. For the reasons stated below, the Court will fully SUSTAIN Antioch's motion. The Court will enforce the settlement agreement as it was memorialized in the attachment to the July 16, 2010, email from Antioch's counsel to Tocci. Doc. #79-6. Furthermore, the Court will grant Antioch's request for attorneys' fees and costs, due to Tocci's vexatious behavior that delayed consummation of the settlement agreement.

Also pending before the Court is Tocci's Motion for Reconsideration (Doc. #91), filed September 4, 2012, requesting that the Court strike the parties' mediation session. Because the Court concludes, as explained below, that the

---

[1] See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994) (recognizing a district court's ancillary jurisdiction over a settlement agreement when "the parties' obligation to comply with the terms of the settlement agreement ha[ve] been made part of the order of dismissal[,] either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order").

2

parties reached an enforceable settlement agreement at the mediation session, the Court OVERRULES Tocci's Motion for Reconsideration (Doc. #91) as moot.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Tocci filed suit against Antioch in the United States District Court for the District of New Jersey on March 21, 2007.  Doc. #2.  The parties' diverse citizenship formed the basis for federal court jurisdiction.  *Id.* at 1-2.  In his complaint, Tocci claimed that Antioch failed to award him a Master of Arts in Conflict Resolution ("MACR"), even after he paid tuition and earned the required credits for the degree.  *Id.* at 2-4.  According to Tocci, Antioch failed to assign or approve an advisor for the thesis that he was required to write, and then unenrolled him as a student after incorrectly claiming that he had failed to pay tuition.  *Id.*  Although Antioch later admitted that Tocci owed them no money, Tocci claimed that the university then prevented him from completing his degree by asserting that he failed to complete the degree requirements within the allowable timeframe.  *Id.*  The foregoing allegations formed the basis for Tocci's claims for breach of contract and negligence claims against Antioch.  *Id.* at 4-8.

The District Court of New Jersey concluded that it lacked personal jurisdiction over Antioch and transferred the case to United States District Court for the Southern District of Ohio on August 28, 2007.  Doc. #1.  Antioch filed for summary judgment on July 29, 2009.  Doc. #19.  The Court granted Antioch's

motion as to Tocci's negligence claim (Doc. #30), but overruled the university's motion as to the breach of contract claim (Doc. #46).

Trial was set for July 12, 2010, to try Tocci's remaining breach of contract claim. Several days before trial, on July 7, 2010, Tocci fired his attorney, David M. Duwel ("Duwel"). Doc. #42. The Court referred the case for mediation on July 9, 2010, to Magistrate Judge Michael R. Merz. Doc. #44. Judge Merz conducted mediation on July 12, 2010, and reported to the Court that the parties had settled the case after one two-hour session. Doc. #47. Accordingly, the Court entered an Order of Dismissal and Termination Entry on July 13, 2010. Doc. #48.

### A. The Draft Settlement Agreement

The same day that the Court entered its Order of Dismissal, counsel for Antioch, Stephen V. Freeze ("Freeze"), emailed Tocci a "proposed Confidential Settlement and Mutual Release Agreement," copying Duwel, Tocci's former attorney. Doc. #79-1. Freeze stated that the draft agreement had been "prepared in accordance with our settlement agreement from yesterday's mediation with Judge Merz." *Id*. Freeze asked Tocci to review the draft, sign it in duplicate, and send back the signed copies. *Id.* Freeze promised to return one copy to Tocci, after its execution by a signing authority from Antioch. *Id.*

The draft of the Settlement Agreement contained several key provisions. First, Antioch agreed to "recognize and assign" 14.5 credit hours to Tocci's transcript "over and above the current recognized total credit hours of 69.5." This

4

would bring the recognized total of Tocci's Antioch credits to 84. *Id.* at 3. In addition, Tocci would be entitled to obtain the MACR degree, conditioned upon his completion of the Capstone course:

> To obtain the MACR Degree, Tocci will complete a Capstone course . . . . Tocci will act pursuant to and in accordance with the course requirements and perform the work as prescribed and identified in Exhibit A. Antioch will treat Tocci just as it would treat any other student participating in and taking such Capstone course. Tocci and Antioch represent and agree that they will both act in good faith with regard to the Capstone course and their respective obligations with regard to such course.
>
> In order to take the Capstone course, Tocci will re-enroll at Antioch as a student. Antioch will not bill Tocci for re-enrolling and taking such course.
>
> Upon successful completion of such Capstone course, Tocci will have completed all requirements necessary to obtain his MACR Degree and such degree will be awarded to him.

*Id.* at 3-4.

If Tocci failed to complete the Capstone course, he would not receive the MACR Degree. *Id.* Completion would entitle Tocci to a diploma, which Antioch would mail to him. *Id.* at 4. Tocci also had the option to attend the graduation ceremony. *Id.* In addition, completing the MACR degree would entitle Tocci to receive a lump sum payment of $25,000 from Antioch. *Id.*

Under another key provision, Tocci would agree to never "publish or seek to publish any book, pamphlet, account or other writing of whatever kind that pertains to, relates, addresses, or otherwise mentions in any way Antioch and/or his dispute and controversy with Antioch relative to the MACR degree and any matter related thereto or arising therefrom." *Id.* Antioch also promised to abide by

5

the Family Educational Rights and Privacy Act ("FERPA"),[2] in response to any third party requests for information about Tocci. *Id.*

The agreement also stated that the parties would release all claims against each other "arising out of, related to, or resulting from Tocci's enrollment and participation in the Antioch MACR program, his status as a student at Antioch," as well as any issue brought about by any interaction between the parties. *Id.* at 5. The agreement recognized that it existed as "a new contract between Tocci and Antioch" subject to a possible action for breach, but the parties would agree to present any issues to Magistrate Judge Merz "for his review, analysis, and proposed resolution" before filing suit. *Id.* The draft also contained a confidentiality clause. *Id.*

Tocci responded to Freeze's email the same day, July 13, 2010, asking if he could review the document with his attorneys and his accountant. Doc. #79-2. Tocci copied Duwel when he responded. *Id.* Freeze replied later that afternoon, stating that he had "no problem" with Tocci's attorneys' or accountant's reviewing the agreement as long as confidentiality was maintained. Doc. #79-3. Freeze also stated that he was making a "revision," so that the agreement would state that Tocci would "receive an additional 4 credit hours upon successful completion of the Capstone [course]." *Id.* Tocci replied immediately and thanked Freeze. Tocci

---

[2] FERPA, codified at 20 U.S.C. § 1232g, was enacted in order to ensure student access to educational records and to protect privacy rights by requiring student consent to the transfer of records. *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67-68 (1st Cir. 2002).

also stated, perhaps presaging the future course of events, "I also want to make a change or two." *Id.*

### B.   A Series of Emails

The next day, July 14, 2010, Tocci emailed Freeze, stating that he had not yet seen his accountant or lawyers, and that his computer was broken and being repaired. Doc. #79-4. Tocci indicated that "[t]he agreement has some flaws which I will correct. If we have an agreement, no problem. If there is a problem or discrepancy, we can work something out." *Id.* Tocci also requested that the agreement specify that Judge Merz could only participate as a mediator in case of a future conflict, stating: "I agree if something were to fail, we would first have Judge Merz continue the mediation. He was very good. If that fails, Judge Rice can call a number or we can go back to trial, just as we agreed to before. But I am sure that you and I can work anything out." *Id.*

Two days later, on July 16, 2010, Tocci again emailed Freeze, apologizing for the delay, but stating that his computer was once again functioning. Doc. #79-4. Tocci promised to send "a correction to the agreement by Monday." *Id.* Tocci then asked, "Once the contract is signed, how long is it before I start the formal Capstone? Please send me the written material on the Capstone so that I may start work now." *Id.*

Freeze replied immediately, reminding Tocci that the agreement required Tocci to reenroll at Antioch before being able to start work on the Capstone

7

course: "[t]hat's why it's important to get the Settlement Agreement signed by the parties so you can commence your work." Doc. #79-6. Freeze also confirmed that he made the change he had previously described, and that Tocci would receive four additional credit hours after completing the Capstone course. *Id*. An updated draft of the agreement was attached to the email. *Id.* at 3-7.

Tocci responded on July 18, 2010, with a new draft of the settlement agreement. Doc. #79-7. The subject of the email was "TOCCI – AN AGREEMENT FOR CONSIDERATION." *Id.* Tocci stated that the new agreement would "better protect Antioch and its employees while facilitating the transfer of credits, money, and degree to me much faster than at a snail's pace." *Id.* The remainder of the email contained the text of a new agreement consisting of twelve numbered paragraphs prefaced by the word "AGREEMENT." *Id.* Many of the paragraphs contained completely new terms and demands by Tocci, including the following:

> 1. From this day forward both Antioch and Tocci will agree that this unfortunate mishap was caused by a computer malfunction/virus.
>
> ...
>
> 3. Tocci will receive from Antioch an updated/corrected copy of his official transcript, totaling 84 graduate credits, within 5 business days of the signing of this agreement.
>
> ...
>
> 6. Antioch will allow Tocci to [] complete the Capstone Project as fast as he possibly can. Antioch recognizes that Tocci is not in good health and places no time limitation on the comp[letion] of the project.
>
> ...

8

8.  Neither Antioch nor Tocci will write, publish, or say anything degrading or disparaging about the other.

9.  Antioch acknowledges that Tocci has previously sent out to various agencies an 84 page booklet with documents and opinions putting Antioch in an unfavorable light. If question[ed] by anyone, Tocci will respond in the following man[ner] reflecting Antioch's generosity: 1. a computer glitch caused the problem. 2. The missing 12.5 credits were found and immediately added to Tocci['s] official Transcript. 3. Antioch re-enrolled Tocci for free. Antioch provided Tocci with a Capstone Project with a current value of $3,500.00 (approx[.]) at no cost to Tocci. Antioch allowed the students of the [MACR]-Independent Study Program to accrue an unlimited amount of credits at no extra cost. Tocci accumulated 28 additional credits over the 60 credit minimum for graduation. The current value of 28 graduate credits is approx[.] $12,600.00. If the 28 credits are accepted in a Ph.D. program[,] the current value is $21,000.00. Tocci is happy that this misfortunate mishap was resolved by Antioch completely in his favor.

10. To put Antioch's "good faith in[to] action, Antioch's Chancellor wi[ll] write a letter, suitable for framing, to Tocci, thanking him for his patience and his mediation skills. Tocci will hang this letter on his wall and give full and final credit to the Chancellor for resolving this mishap in a generous man[ner].

...

12. Upon Tocci's receiving of his original MACR Degree and Final Transcript reflecting 88 graduate credits, the agreement is fulfilled and the case is closed.

*Id.*

On July 22, 2010, Freeze responded to Tocci's email. Doc. #79-8. In it, Freeze expressed confusion as to why Tocci "started from scratch" with his "own version of the settlement agreement," as Freeze had already prepared the settlement agreement in accordance with the mediator's request. *Id.* at 1. Freeze

9

noted that he had added the provision granting four credits upon completion of the Capstone course hours at the suggestion of Duwel, who believed that with such an addition, the draft reflected the terms that the parties agreed to at mediation. *Id.*

Freeze also responded individually to the terms of Tocci's new agreement. *Id.* at 2-3. He refused to agree to Tocci's suggestion that "Antioch and Tocci will agree that this unfortunate mishap was caused by a computer malfunction/virus," or to Tocci's demand for a frame-worthy certificate signed by the Antioch chancellor attesting to Tocci's mediation skills. *Id.* Freeze agreed to the provision that neither party would "write, publish, or say anything degrading or disparaging about the other," but objected to the rest of Tocci's proposals as "already covered" by provisions in the version he had drafted. *Id.*

Tocci responded via email on July 24, 2010, describing the settlement agreement as a "'mediated agreement,' which is quite different than a pre-trial settlement or a judicial order." Doc. #79-9. Tocci stated that, as a mediator, he had drafted 185 such agreements for over 400 disputants, none of whom ever returned to court after utilizing his services. *Id.*

He then provided a description of the salient characteristics of a "mediated agreement," which included "simple language," having "a time line of interacting exchanges, which demonstrates, in real time, both good faith and progress." *Id.* According to Tocci, "[t]he mediation process answers all of the 'why' questions. The mediated agreement leaves no 'ifs.' Mediation, unlike litigation, vindicates both parties and allows both parties to end the dispute with dignity. True

10

mediation aims for the happily ever after ending." *Id.* He characterized the agreement drafted by Freeze as having "no time line. It combines issues and make[s] one issue depend[e]nt on another. It is end loaded and open ended at that." *Id.* Specifically, Tocci protested the term in the agreement that "linked the 14.5 credits and the money to graduation." *Id.*

Tocci protested that he was not being "treated as any other student," in accordance with the agreement Freeze had drafted. *Id.* He also demanded a syllabus for the Capstone class, and to know the date when the class would start. *Id.* at 2. Tocci accused Antioch and its officials of committing a felony by stealing his credits, and claimed that Antioch was using the 14.5 credits it owed to him as leverage in bargaining that amounted to "extortion." *Id.* He also accused Antioch of conspiracy, based on the allegations that gave rise to his original lawsuit against the school. *Id.* Tocci agreed to "eliminate" the first two provisions of his version of the Settlement Agreement, but only if Freeze and Duwel would admit to the Court "that you both created and have perpetuated the bad guy persona that you have attributed to me," which Tocci felt was "reflected in your version of the Agreement." *Id.*

On August 2, 2010, Tocci emailed Freeze again, upset that he had not yet received a response to his "reasonable letter" of the previous week. Doc. #79-10. Tocci reiterated his demand for a syllabus, and warned that he would contact Judge Merz and inform him "that you would not comply with the agreement in a timely fashion" if he did not receive the syllabus or an assigned professor by the

11

end of the week. *Id.* Tocci also threatened to "sue your client for 1.3 million dollars." *Id.*

The same day, Freeze responded to Tocci's follow up email. Doc. #79-11. Freeze conceded that a phone conference "with Judge Merz may be required," but stated that "[t]he case is settled – we simply need to reduce the terms to writing." *Id.* Freeze pointed out that in spite of their correspondence and Tocci's review of the drafts, Tocci "still had not identified any inaccuracies in the agreement" that Freeze had prepared. *Id.* Freeze then addressed the three main issues Tocci had written about in the July 25, 2010, email: "credits, money, and an MACR degree." *Id.* He emphasized that the immediate grant of 14.5 credits would not be linked to Tocci's graduation. *Id.* Freeze also stated that although the $25,000 settlement was "linked to successful completion of the Capstone," Tocci had agreed to that term during mediation. *Id.* Furthermore, because the degree would be granted after completion of the course, Freeze asserted that "[t]he time line for these items is in the agreement." *Id.* He then reminded Tocci that Antioch was willing to allow him to start the course late, even though the quarter had already begun. *Id.* Freeze concluded by stressing the need to get the agreement signed "so you can get started," and assured Tocci that he would continue to press Antioch for the syllabus and the name of the professor. *Id.*

Tocci responded the next day, August 3, 2010. Doc. #79-12. After comparing Freeze's clients to the Three Stooges, Tocci asserted that "[a]t this moment, we have no agreement. There is nothing signed. ... I would not sign a

12

contract linking the $25,000 to the graduation. One has nothing to do with the other." *Id.* Tocci reiterated his demands for a syllabus and a professor for the Capstone class, stating that unless he had them "by the end of the day on Friday, the settlement will cost Antioch 50k." *Id.* Tocci then proposed an "alternate idea." *Id.* He offered to delay his execution of the settlement agreement until after passing the Capstone course, at which time Antioch would give him the settlement award, all 88 credits, and the MACR degree. *Id.* "But in case something goes south, I retain the ability to go to court and sue." *Id.*

Three days letter, Freeze responded to Tocci's email. Doc. #79-13. Freeze reiterated Antioch's position that a settlement had been reached, identifying "[t]he only difficulty" as Tocci's refusal to sign the agreement. *Id.* at 1. Freeze agreed to suggest to Antioch that the payment of the $25,000 settlement not be made contingent upon Tocci's passage of the Capstone class, but he again reminded Tocci that the 14.5 non-Capstone credit hours were not contingent upon completion of that course. *Id.* at 1-2. Freeze also clarified that "[a]ny Capstone student would be required to enroll, or in your case, re-enroll, to take the course and would receive a syllabus the day before the course began." *Id.* at 2. However, Freeze offered Tocci the "accommodation" of having Antioch arrange for Tocci "to speak with the Capstone professor in advance of the start of the course," provided that Tocci signed the settlement agreement. *Id.* Freeze also stated that Antioch was not interested in terms other than those already agreed to, such as the ones Tocci mentioned in his August 3, 2010 email. *Id.* Freeze

13

concluded by stating that if Tocci did not sign the agreement, he would file a Motion to Enforce the Settlement Agreement with the Court. *Id.*

Tocci responded on August 8, 2010, stating that he was "disappointed" in Freeze's letter. Doc. #79-14. Tocci again stated that the parties had "no agreement," and asserted that the case had been dismissed "based on the premise that the agreement [was] signed." *Id.* Tocci accused Antioch of adding new conditions and was "delay[ing] performance" of the agreed-to terms. *Id*. Specifically, Tocci demanded to know why Antioch had not yet provided him with the "revised transcript reflecting a total of 84 graduate credits." *Id.* Because Tocci had not yet received the transcript, he viewed the claim that the credit hours were not linked to the completion of the Capstone course with suspicion. *Id.*

Tocci also argued that he knew Antioch students who had been provided with "a syllabus and access to the professor weeks before" starting the class, and that Tocci had to know what he was agreeing to, in terms of the professor's expectations, before signing the contract. *Id.* Tocci also accused Freeze of violating the rules of mediation by not having all persons who could make decisions on behalf of Antioch at the mediation session. *Id.* at 2. Tocci asserted that Antioch's actual liability to him was $32,800 more than the settlement terms, and that he expected to receive a fax of his transcript by the end of the day. *Id.*

At this point, Duwel, Tocci's former attorney, stepped in and responded to Tocci's email.[3]  Doc. #79-15.  Duwel stated that he "was present at the mediation when Judge Merz read the terms of the agreement to you and Steve and both of you agreed to the terms," and cautioned Tocci that his "battle" with Freeze would inevitably lead to the Court's enforcement of the settlement agreement.  *Id.*

Tocci responded to Duwel on August 10, 2010, asserting that "[a]t the time of the mediation, which was a month ago, we agreed to terms.  We did not reduce the terms to writing or agree on the system or schedule to which the terms would be delivered."  Doc. #79-16.  After criticizing Duwel's negotiating abilities, Tocci stated:

> I told you, if I do not get my MACR Degree I will be publishing a book entitled, "THE CASE AGAINST ANTIOCH – a Nightmare in Distance Learning."  There is a chapter dedicated to you and Freeze.  It is not flattering.  Just by telling the truth your sterling reputations will be in the toilet.  Do you want to go out this way?

Tocci also stated that the book was already two-thirds complete, just from the accrual of primary source materials that he had gathered during litigation.  *Id.*

Tocci wrote Freeze the next day, August 11, 2010, and again offered to defer signing the agreement until after passing the Capstone course.  Doc. #79-17.  He also repeated his demand for a syllabus and an assigned professor before any action on his part, stating: "I must have this."  *Id.*

---

[3] Both Tocci and Freeze had routinely copied Duwel on the emails exchanged after the conclusion of the mediation session.

On August 24, 2010, Tocci emailed the Court directly, and stated that "[t]he Mediation has failed to be conclusive or produce a signed agreement. I am requesting either a trial or arbitration." Two days later, Tocci again wrote to the Court, and reiterated his request. Tocci asserted that the rules of mediation required the process to produce a signed agreement by the parties, otherwise "the dispute goes directly to court and a judge."[4]

Tocci emailed Duwel again on September 6, complaining that he had not yet "received a syllabus or a phone call from a professor." Doc. #79-18. Duwel responded the next day, and attempted to explain his perspective of the situation to Tocci:

> I believe you agreed to certain terms at the mediation to settle the case. However, nothing would happen (for example, talking to a professor, receiving a syllabus) until the settlement agreement was executed. This is how things are handled in a lawsuit. No one starts performing their obligations under the settlement until the agreement is signed.

Doc. #79-19.

Duwel also stated that he believed that Tocci had "negotiated a great settlement and I'm not sure how it got derailed," and warned Tocci that his disadvantages as a *pro se* plaintiff, such as not knowing the rules of evidence and practice in court, would likely result in "los[ing] everything that has been offered to you." *Id.*

---

[4] Tocci emailed the Court directly on both occasions, without filing a formal motion or notice with the Clerk's office.

16

Tocci responded to Duwel on September 9, 2010, copying Freeze (as well as Judge Merz's chambers).  Doc. #79-20.  Tocci characterized the terms of the settlement agreement as "giv[ing] Antioch the benefit of a one sided open ended contract."  *Id.*  Tocci expressed frustration that he never received any illumination into Antioch's motives, and speculated that the school was trying to "frustrate [him] in[to] quitting or settling on their terms."  Tocci also asserted that his actual damages amounted to over $100,000, based on the expense of obtaining the MACR degree.  *Id.*  In addition, Tocci threatened to write "The Case Against Antioch" if he were not paid $50,000, because, if the case went to trial, '[a]t that point they will have to pay me not to publish it."  *Id.* at 1-2.  In the book, Tocci planned to give one Antioch official the "title (in one form or another) ... [of] 'An Evil Woman.'"  *Id.* at 2.  Tocci described the experience of pursuing the litigation as "not fun.  It is educational."  *Id.*  He also described two books he planned to write.  One was a children's book based on conversations with his cat, and the other was to be titled a "A Mediation Primer."  *Id.*  Tocci promised that Duwel and Freeze would receive both "honorable mention" and autographed copies of the primer.  *Id.*

## C.    Antioch Files its Motion to Enforce the Settlement Agreement

On September 14, 2010, Antioch filed a Motion to Enforce the Settlement and a Motion for Sanctions Including Attorney Fees and Costs ("Motion to Enforce").  Doc. #50.  Therein, Antioch argues that the mediation resulted in a

17

meeting of the minds, binding both Tocci and Antioch to the terms of the parties' agreement. *Id.* at 10, 15-19. Antioch argues that because Tocci has refused to comply with the terms of the settlement agreement, the Court should enforce the settlement agreement that Antioch believes the parties agreed to. Antioch also seeks attorney fees and costs, alleging that Tocci has threatened Antioch and its attorneys, as well as unnecessarily delayed settlement. *Id.* at 17-19.

A flurry of responses, replies, sur-replies, a motion to strike, and supplemental memoranda followed the filing of Antioch's Motion to Enforce. The parties' filings included the following: Tocci's "Cross Motion to Dismiss," filed on October 12, 2010 (Doc. #54), which the Court construes as a Response in Opposition to Antioch's Motion to Enforce the Settlement Agreement; Antioch's Reply to Tocci's Response, filed on October 29, 2010 (Doc. #56); Tocci's Sur-Reply to Antioch's Reply, filed on November 11, 15, 2010 (Doc. #58); Antioch's Motion to Strike Tocci's Sur-Reply, filed on November 18, 2010, (Doc. #59), which, in a notation order, the Court overruled without prejudice and allowed Antioch 14 days to respond to Tocci's Sur-Reply (Doc. #58); Tocci's Supplemental Memorandum in Opposition to Defendant's Motion to Enforce the Settlement Agreement, filed on November 30, 2010 (Doc. #60); Tocci's Response to Antioch's Motion to Strike, filed on December 2, 2010 (Doc. #62); A Sur-Reply, filed by Antioch on December 3, 2010, in Support of its Motion to Enforce the Settlement Agreement (Doc. #63); Tocci's Supplemental Memorandum Opposing the Motion for Settlement (Doc. #64); Antioch's Supplemental Motion to Strike

18

(Doc. #65) two filings of Tocci (Doc. #60 and Doc. #62), filed on December 8, 2010; Tocci's Motion for Immediate Return of 14.5 Stolen Graduate Credits (Doc. #66) filed on December 16, 2010; Tocci's Motion to Address Antioch's Supplemental Motion to Strike (Doc. #67) filed December 20, 2010; Antioch's Supplemental Motion to Strike Tocci's Motion for Immediate Return of 14.5 Stolen Graduate Credits (Doc. #68), filed December 22, 2010; Tocci's Motion to Address Antioch's Attempt to Petition the Court for a Double Standard of Discriminatory Practice (Doc. #69), filed December 27, 2010; and Tocci's Response to Supplemental Motion to Strike (Doc. #70), filed December 27, 2010.

On July 18, 2011, the Court notified the parties that an evidentiary hearing would be held on September 15, 2011.  On September 2, 2011, in light of the impending oral and evidentiary hearing to be held on Antioch's motion, the Court overruled, without prejudice to renewal, all pending motions that the parties had filed in the wake of Antioch's Motion to Enforce.  Doc. #73.  In anticipation of the hearing, Antioch served subpoenas on Magistrate Judge Michael Merz (Doc. #74) and attorney David Duwel (Doc. #75).  In response to Antioch's subpoena, Judge Merz filed a Mediator's Motion in Limine on September 7, 2011, seeking clarification as to the acceptable scope of his testimony in light of the privileges surrounding mediation.  Doc. #76.  Tocci sent a letter to the Court on September 12, 2011, objecting to the presence of Duwel at the hearing as a witness.  Doc. #78.

19

### D.     The Evidentiary Hearing

On Thursday, September 15, 2011, the Court held an oral and evidentiary hearing on Antioch's Motion to Enforce the Settlement Agreement.  Doc. #81. The Court heard testimony from Duwel, Judge Merz, Freeze, and Tocci, and accepted into evidence various exhibits offered by the parties, including drafts of the Settlement Agreement and the emails and letters heretofore described.  *Id.*

Duwel testified that at the time of the mediation, he had no attorney-client relationship with Tocci, having been fired as his attorney the week before.  He attended the mediation at the request of the Court, in order to assist the parties in resolving the dispute.  Duwel stated that, during mediation, the parties agreed to settlement terms and the case was settled, and that mediation concluded as a result of the settlement having been reached.  After mediation concluded, he received a copy of the settlement agreement that Freeze had reduced to writing. According to Duwel, the initial draft of the settlement agreement deviated from the terms agreed to at mediation in one way: it omitted the awarding of four credit hours to Tocci.  After notifying Freeze of the omission, Duwel received a revision of the settlement agreement that provided Tocci with the four credits.  With that addition, Duwel testified that the draft agreement accurately represented what the parties agreed to during mediation.

Duwell also confirmed that he had communicated to Tocci, via email, that Duwel believed that the draft settlement agreement accurately reflected what the

20

parties had agreed to at mediation. In pertinent part, Duwel's email to Tocci stated that:

> Judge Merz read every item of the agreement in quotes to you, and I heard you say that you agreed. You cannot obviously deny that the only reason that something wasn't signed is because you were in New Jersey under the care of your physicians. Had you been in Dayton you would have signed a statement of the items Judge Merz read off.

On cross-examination by Tocci, Duwel stated that Tocci consistently held the position for years that, prior to agreeing to take a particular capstone class to finish the requirements for the MACR, he would have to know what work would be required, which professor would teach the class, and what the schedule and syllabus for the class would be. Nevertheless, Duwel affirmed that "[t]here was an agreement of the parties reached at mediation. There were no qualifying terms and conditions. There was nothing left to be done but to execute the agreement that the parties reached at the mediation."

Judge Merz testified that he had been assigned by the Court to preside over the mediation between the parties on July 12, 2010. He did not participate in the case for any other purpose, as another Magistrate Judge was assigned to its pretrial case management. Tocci was allowed to participate in the mediation session by telephone from New Jersey.

Judge Merz stated that the parties, including Tocci, reached an agreement during the mediation session that he conducted. The only reason that Judge Merz did not have Tocci sign a document at the end of the mediation session was that

Tocci's physical location in New Jersey made it impossible. Furthermore, Judge Merz testified that, when obtaining a parties' signature at the end of a session was impossible, his "usual practice" was to put the terms on the record in open court. However, court recording equipment was not available the day of the mediation session, making such an oral record impossible. For that reason, Judge Merz asked Freeze to memorialize the settlement agreement.

Judge Merz was able to recall the terms of settlement that the parties had agreed to with specificity, relying both on his memory and notes that he had taken during the session. Judge Merz was "very firm" about the parties' agreeing to a $25,000 settlement figure. He also testified that the parties had agreed to the confidentiality of the settlement agreement; the restraint on publication of Tocci's book; the requirement that Tocci complete a one-quarter course to obtain the MACR degree; the parties' mutual release of claims against each other; and that any statements made by Antioch to a third party would be constrained by FERPA. Judge Merz had not seen the draft of the settlement agreement, but he testified that he would have expected any draft to contain the aforementioned terms.

During cross-examination, Tocci asked Judge Merz if he recalled Tocci's request that he "wanted a class schedule, a syllabus, and I wanted to speak to the professor" teaching the capstone class. Judge Merz did not recall Tocci making that request. Furthermore, Judge Merz stated that he understood that acquiring the degree and not writing the book "were both conditions of settling the case,"

but did not, upon questioning by Tocci, recall that Tocci would only agree to not write the book if and when he received the degree.

Judge Merz's notes reflected that the capstone course would be a one or two quarter class "taught by whoever assigned," pursuant to a discussion that Tocci would be permitted to have with a department chair about who would teach the capstone course.  Judge Merz did not recall any kind of timeline for when the capstone course was to start other than after the settlement agreement was signed, nor did he recall a request by Tocci to speak with the course professor prior to signing the agreement.  Tocci asked: "You do not remember me saying I would not sign the agreement without having a class schedule, a syllabus, and to speak to the professor because of what I was told prior to signing?"  Judge Merz replied: "I expressly remember that you did not say that.  We had an agreement. The agreement was to be signed and then things were to proceed after the signing of the agreement."  Judge Merz did, however, remember that "as an accommodation to Mr. Tocci," Antioch provided Tocci "with information about the capstone course that he wanted to take" at the mediation.

Freeze testified in detail regarding the circumstances leading up to the mediation and the terms of settlement agreed to at that time.  Freeze also stated that he provided Tocci with a description of the capstone course required to complete the MACR by email, on the morning of the mediation session, "so that he would have that available to him," and that he brought the same information to the session.  Freeze also confirmed that he made the change requested by Duwel to

23

include the four credit hours discussed during mediation that had been omitted from the original draft.  In addition, he stated that he never heard from Tocci "as to what he thought was incorrect on the settlement agreement" during the series of email correspondence that followed mediation.  Freeze also summarized the contents of the emails between himself and Tocci.  Finally, Freeze testified in support of the motion for attorneys' fees and costs to compensate for the time "spent dealing with what we believe to be recalcitrance on the part of Mr. Tocci in trying to actually live by the agreement he made," which he dated from July 19, 2010, through August 31, 2011.  Freeze argued that attorneys' fees should be dated from work performed starting July 19, 2010, because the day before, Tocci had sent out his own version of the settlement agreement, signaling "a clear departure from any real intent" to settle the case.

Tocci testified last.  He began his testimony by providing a background sketch of his fifteen years' experience as a mediator, his initial pursuit of the MACR degree at Antioch, and the events that prompted the lawsuit he filed against the university.  Tocci stated that "key points were agreed to orally" during the mediation, but that the draft settlement agreement was not agreed for several reasons, to wit: "key issues" were missing from the draft settlement agreement; the "commodities that were to be delivered upon signing were end loaded"; the agreement lacked a timeline; there was no neutral monitor "on the issue of a capstone"; and "Antioch never concluded the mediation by providing a meeting with the professor."  Tocci concluded with a statement detailing his prior success

24

as a mediator in New Jersey state court and his commitment to the mediation process.

## II. THE MOTION TO ENFORCE THE SETTLEMENT

"Because settlement agreements are a type of contract, the formation and enforceability of a purported settlement agreement are governed by state contract law." *Smith v. ABN AMRO Mortg. Group, Inc.*, 434 Fed. App'x 454, 460 (6th Cir. 2011) (citing *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150 (6th Cir. 1992)). Furthermore, if the district court's jurisdiction is premised on diversity of citizenship, as it is here, the choice of law rules of the forum state apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941); *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 302 (6th Cir. 2008). Where the "primary question" is whether the parties entered into a settlement agreement at all, the district court must apply the choice-of-law rules of the forum state. *Bamerilease*, 958 F.2d at 152 (citing *Lee v. Hunt*, 631 F.2d 1171, 1173-74 (5th Cir. 1980)). Thus, the Court must first apply the choice of law rules of Ohio, the forum state, to determine which state's substantive law applies. After a discussion of the choice of law applicable to the purported settlement agreement, the Court will apply the relevant law to the record as outlined above, and determine whether the parties reached an enforceable agreement.

25

**A.    The Choice of Law Analysis**

The Court notes that Antioch cites Ohio contract law in support of its arguments, apparently assuming that it applies to the issue of the enforcement of the settlement agreement.  Doc. #50 at 9.  However, there is no indication in either the drafts of the settlement agreement exchanged by the parties or the testimony of the parties that they intended for Ohio law to apply to the agreement. Furthermore, Tocci is a citizen of New Jersey, and he originally filed suit against Antioch in U.S. District Court for the District of New Jersey.  Doc. #2 at 1-2; *see* Doc. #1-1 (transferring case to this Court because U.S. District Court for the District of New Jersey lacked personal jurisdiction over Antioch, an Ohio non-profit corporation).  Tocci did not choose to litigate in Ohio, and he conducted all of his negotiations with Antioch remotely.  Some analysis of the choice of law issue is, therefore, a necessary prerequisite to the application of any particular body of contract law.

As mentioned above, the Court must apply the choice-of-law rules of the forum state. *Bamerilease*, 958 F.2d at 152.  Ohio applies the "factor-driven 'significant relationship' approach set forth at Sections 187 and 188 of the Restatement of Conflicts" to resolve choice-of-law issues that arise in actions based in contract.  *Ohayon v. Safeco Ins. Co. of Illinois*, 747 N.E.2d 206, 220 (Ohio 2001); *see also Power-Tek Solutions Servs., LLC v. Techlink, Inc.*, 403 F.3d 353 (6th Cir 2005) (citing *Ohayon* and upholding application of Section 188 to

26

choice-of-law question in breach of contract claim). Relevant here is Section 188[5] of the Restatement, which addresses the "Law Governing In Absence Of Effective Choice By The Parties." Restatement (Second) of Conflict of Laws §188. First, Section 188 states that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties" to the contract. *Id.* Second, Section 188 lists the factors a court should consider to determine the state with most significant relationship: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties." *Id.* § 188(2). Each of the foregoing factors should "be evaluated according to their relative importance with respect to the particular issue." *Id.* § 188(2)(e).

The first factor considers the place of contracting. "The place of contracting is determined by the last act necessary for a contract to be binding." *Riddle v. Wiegand*, 2003-Ohio-3072, 2003 WL 21373159 at * 4 (citing Restatement (Second) of Conflict of Laws §188, cmt. e). Here, Antioch's counsel and representatives were located in Ohio during the mediation session, and Tocci participated by telephone from New Jersey. However, there is no evidence to

---

[5] Section 187 of the Restatement, which is not relevant here, applies if parties explicitly choose the law of a particular state to govern their agreement. *See* Restatement (Second) of Conflict of Laws §187 cmt. a.

indicate which party expressed acceptance to a final proposal by the other party,

and consequently led Judge Merz to conclude that an agreement had been

reached. Without any evidence of what "last act" constituted the acceptance that

sealed the deal, the "place of contracting" factor holds no weight in the choice of

law analysis.

For the same reason, the second factor, which concerns the place of

negotiation, holds little weight. Although the Restatement characterizes the place

of negotiation as "a significant contact," the significance is diminished "when there

is no one single place of negotiation and agreement, as, for example, when the

parties do not meet but rather conduct their negotiations from separate states by

mail or telephone." Restatement (Second) of Conflict of Laws §188, cmt. e.

Here, Tocci never ventured to Ohio from New Jersey during the pre-mediation

period of negotiation. Furthermore, as indicated, the parties were located in two

different states during the mediation session. Thus, the place of negotiation factor

favors neither state's law.

Similarly, the place of performance favors neither the law of Ohio or New

Jersey. The situation here is contemplated by the Restatement, which provides

that "the place of performance can bear little weight in the choice of the applicable

law when . . . performance by a party is to be divided more or less equally among

two or more states with different local law rules on the particular issue." *Id.* The

terms of the purported settlement agreement require Antioch to perform by

recognizing additional credit hours on Tocci's transcript, re-enrolling Tocci,

28

awarding the MACR degree to Tocci, and paying Tocci the agreed-to settlement sum. Tocci, in exchange, must perform by completing all the coursework for the Capstone class, refrain from publishing any book regarding his controversy with Antioch, and releasing all claims against the school. Tocci will complete the work in New Jersey, not Ohio. Thus, there is no concentration of performance in one state, and a failure by either party to perform could implicate the law of either state if the other party sues for breach of the agreement. The place of performance factor, therefore, provides little guidance in the choice of law analysis.

The fourth factor, the location of the subject matter of the contract, concerns a contract that "deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk," neither of which are relevant to the present controversy. *Id.*

Under the fifth factor, "the domicil, residence, nationality, place of incorporation and place of business of the parties" should "be evaluated according to their relative importance with respect to the particular issue." *Id.* Tocci is domiciled in New Jersey and is a citizen of that state, and Antioch is incorporated in Ohio and is a citizen of Ohio.[6] *See* 28 U.S.C. §1332(c)(1) (stating that, for

---

[6] The Court may take judicial notice of the fact that Antioch University is registered with the Ohio Secretary of State as a "Corporation for Non-Profit," with its principal place of business in Yellow Springs, Greene County, Ohio. *See*, *e.g.*, *Arvest Bank v. Byrd*, 814 F.Supp.2d 775, 787 (W.D. Tenn. 2011) (taking judicial notice of the plaintiff's registration on the Arkansas Secretary of State website for the purpose of analyzing diversity of citizenship jurisdiction).

purposes of diversity of citizenship jurisdiction, "a corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business"). Thus, the fifth factor also gives equal weight to the contacts of both states and fails to resolve the choice-of-law analysis.

In spite of the apparent equipoise of contacts from the two interested jurisdictions, the Court believes that the contacts with Ohio slightly outweigh those of New Jersey. First, both New Jersey and Ohio appear to have a "significant relationship" to the formation issue only because of a last minute concession to Tocci that allowed him to participate in the mediation remotely. Mediation was ordered three days before the set trial date, with the condition that if mediation failed, the parties would go to trial on July 13th, 2010. The mediator and the Defendant were certainly justified in expecting the proceedings to occur in Ohio, and, if Tocci had participated in the mediation in Ohio as the parties expected, New Jersey would have no contacts pursuant to the "place of contracting" and "place of negotiation" factors. The fact that New Jersey's relationship to the controversy resulted from an unforeseeable accommodation to Tocci diminishes that state's interest compared to that of Ohio, where the parties certainly expected the mediation and the trial, if needed, to take place.

Second, with the exception of Tocci, the mediator and the witnesses who were called at the evidentiary hearing are all in Ohio. Thus, much of the evidence pertinent to the issue of formation is located in Ohio. This fact also tips the scales

30

slightly in favor of applying Ohio law. Finally, there has been no objection from

Tocci, in his response to Antioch's Motion to Enforce the Settlement Agreement,

to the Defendant's application of Ohio contract law. Because he has voiced no

opposition to the application of Ohio law, and because the aforementioned factors

favor its application, the Court will apply Ohio contract law to the controversy

surrounding the formation of the parties' settlement agreement.

**B.      The Application of Ohio Law to Issue of Whether the Parties Reached
a Settlement Agreement**

Antioch argues that both objective evidence and the parties' conduct

demonstrate that the parties entered into a valid, enforceable settlement agreement

at mediation. Doc. #50 at 10-11. Antioch points to the Mediator's Report to the

Court, which stated that the mediation "resulted in an agreed resolution of the

case," and the Court's Order of Dismissal, which stated that the case had been

settled. *Id.* Antioch also points to statements by Tocci's former attorney, Duwel,

that a settlement was reached, as well as Tocci's own acknowledgment in emails.

*Id.* at 15. Antioch also argues that an oral agreement reached in mediation is

enforceable if it satisfies the requirements of a valid contract, whether or not it is

reduced to writing and executed by the parties. *Id.* at 17.

In response, Tocci argues that the lack of a signed, written agreement is

fatal to Antioch's Motion to Enforce. Doc. #54 at 3-4. Tocci characterizes a

signed agreement as a requirement of a successful mediation. *Id.* at 4. Tocci

accuses Freeze, Antioch's counsel, of "attempting to turn a mediation session into

a trial," attempting to infringe on his First Amendment right to write a book detailing his experiences with Antioch, and breaking the confidentiality rules that protect mediation. *Id.* at 6-7. Tocci claims that he refused to sign the agreement that Freeze prepared "because it did not accurately represent what was agreed to during the [m]ediation session." *Id.* at 9. In addition to requesting that the Court overrule Antioch's Motion to Enforce, he asks the Court to impose sanctions on both Freeze and his former attorney, Duwel, "for breaking the confidentiality rule of [m]ediation and perpetrating a hoax on the court." *Id.* at 11.

The Ohio Supreme Court considers it "axiomatic that a settlement agreement is a contract designed to terminate a claim by preventing or ending litigation[,] and that such agreements are valid and enforceable by either party." *Cont'l W. Condo. Unit Owners Ass'n v. Howard E. Ferguson, Inc.*, 660 N.E.2d 431, 432 (Ohio 1996). "The result of a valid settlement agreement is a contract between parties, requiring a meeting of the minds as well as an offer and an acceptance thereof." *Rulli v. Fan Co.*, 442 N.E.2d 337, 339 (Ohio 1997) (citing *Noroski v. Fallet*, 442 N.E.2d 1302, 1304 (Ohio 1982)). A more comprehensive statement set forth by the Ohio Supreme Court defines a contract "as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp 409, 414 (N.D. Ohio

1976)). Thus, "[a] meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.* (citing *Episcopal Ret. Homes, Inc. v. Ohio Dep't of Indus. Relations*, 575 N.E.2d 134 (Ohio 1991)). The essential terms of an enforceable settlement agreement must be "reasonably certain and clear." *Rulli v. Fan Co.*, 442 N.E.2d 337, 339 (Ohio 1997). "Where the meaning of terms of a settlement agreement is disputed, or where there is a dispute that contests the existence of a settlement agreement, a trial court must conduct an evidentiary hearing prior to entering judgment." *Id.* at paragraph 1 of the syllabus.

Here, the parties dispute whether or not they reached a meeting of the minds during the July 12, 2010, mediation session. Simply put, Antioch believes that Tocci accepted the terms it offered for settlement at mediation, while Tocci insists that he did not, as evidenced by the failure of mediation to produce a written, signed agreement memorializing his assent. Consequently, the question of assent manifested by Tocci was the focus of the evidence presented at the evidentiary hearing conducted by the Court.

### 1. *Tocci assented to the settlement agreement during mediation.*

To determine whether the parties have manifested mutual assent, "the law is only interested in objective manifestations of intent." *Rudd v. Online Resources, Inc.*, No. 17500, 1999 WL 397351 at *5 (Ohio Ct. App. June 18, 1999) (citing *Nilavar v. Osborn*, 711 N.E.2d 726 (Ohio Ct. App. 1998)). Because the inquiry examines the parties' outward, objective manifestations of intent, "expressions of

33

assent are generally sufficient to show a meeting of the minds." *Nilavar*, 711 N.E.2d at 733. For this reason, "[s]ecretly held, unexpressed intent is not relevant to whether a contract is formed." *Id.* Rather, a party manifests assent "wholly or partly by written or spoken words or by other acts or by the failure to act." *Ford*, 620 N.E.2d at 1006 (citing Restatement (Second) of Contracts § 19(1) (1981)). Because "manifested mutual assent rather than actual mental assent is the essential element in the formation of contracts," one party's "mistaken idea" as to whether acceptance of an offer has occurred cannot overcome the recognition of mutual assent based on conduct. *Id.* at 1007 n.2.

The Court puts great weight on the testimony of Magistrate Judge Michael Merz, who served as the mediator during the July 12, 2010, session between the parties. Judge Merz testified unequivocally that the parties, including Tocci, had "absolutely" reached an agreement during the two-hour mediation session.[7] Judge Merz's perceptions and conclusions were based on his personal recollection of the

---

[7] On September 7, 2011, Magistrate Judge Merz filed a Mediator's Motion in Limine, requesting clarification regarding the scope of his testimony at the evidentiary hearing in light of any applicable mediation privilege. Doc. #76. Judge Merz's motion invoked Local Rule 16.3(c) of the United States District Court for the Southern District of Ohio, which states that communications made during mediation proceedings conducted under the authority of the Court are confidential and subject to any applicable privilege. During the evidentiary hearing, the Court ruled that Judge Merz could testify to the facts surrounding the mediation relevant to the determination of whether or not a settlement was reached. Rather than provide instructions for the scope of Judge Merz's testimony, the Court stated that it would rule on any objections that the parties made to specific questions put to Judge Merz. During their examination of Judge Merz, the parties raised no objections. Instead, they quizzed him regarding specific communications made during the mediation session without objection, thereby waiving any applicable privilege.

parties' conduct during the mediation session. He based his conclusion that the parties reached an agreement on objective manifestations of assent exhibited by the parties during the mediation session.

In addition, Judge Merz's request that Freeze prepare a written settlement agreement and the immediate filing of the post-mediation report further demonstrate that Judge Merz observed that the parties manifested objective indicia of assent during mediation. The Court does not interpret Tocci's lack of physical presence at the mediation, or the lack of a signed writing or a contemporaneous memorialization of the agreement, as omissions or "failure[s] to act" that might demonstrate Tocci's objective failure to consent to the agreement. Rather, as a courtesy, Tocci was permitted to participate telephonically due to health reasons. Furthermore, Judge Merz deviated from his "usual practice" of putting the terms of a settlement on the record only because the space in which he conducted the mediation did not have the court recording equipment normally used for that purpose. Tr. at 60.

Furthermore, Duwel, who was also present at the mediation, also testified that, based on his observations, the parties had reached a settlement agreement. Duwel's testimony recalled specific statements that he made to Tocci in emails after the mediation session.[8] For example, on August 9, 2010, he emailed Tocci

---

[8] The Court notes that the emails from Duwel were admitted by Antioch into evidence without any hearsay objection by Tocci. The Court expressly provided Tocci with the opportunity to object to their admission, and Tocci declined to object. Furthermore, all declarants were available for cross-examination, and "[a]

and stated: "I was present at the mediation when Judge Merz read the terms of the agreement to you and Steve [Freeze] and both of you agreed to the terms. . . . Tony, you agreed to everything Steve has put together. I was there and heard you agree." Doc. #79-15. On September 7, 2010, Duwel stated "I believe you agreed to certain terms at the mediation to settle the case," and mentioned "the terms you agreed to at the mediation" with Antioch. Doc. #79-19. Duwel was no longer Tocci's attorney when he made the foregoing statements, having been fired by Tocci several days before the mediation. Thus, the Court credits Duwel's observations as it would those of a neutral third party, and, like Judge Merz's testimony, finds that they offer strong support for Antioch's contention that the parties reached a settlement agreement during mediation.

Perhaps most importantly, Tocci's words and actions after the conclusion of the mediation session objectively demonstrate assent to the settlement agreement. For example, in a July 24, 2010, email to Freeze, Tocci stated that he and Antioch "have agreed on what was to be transferred and completed," although not "the method or timeline." Doc. #79-9. On August 2, 2010, Tocci write to Freeze and demanded to speak to a professor and receive a class syllabus within four days or he would "write to Judge Merz stating that you would not comply with the

---

court can consider post-settlement correspondence in resolving a settlement dispute." *Tsakanikas v. Nationstar Mortg., LLC*, No. 2:12–cv–176, 2013 WL 3155777 (June 20, 2013) (citing *RE/ MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 648 (6th Cir.2001)).

agreement in a timely fashion." Doc. #79-10. Tocci was not concerned with the essential terms of the agreement. Rather, he was angry with Antioch for not yet performing in accordance with those terms, while, at the same time, he actively refused to sign the agreement memorializing them. His refusal in no way distracts from the fact that he manifested assent to the agreement, a finding demonstrated by his own words, as well as the testimony that the Court heard from Duwel and Judge Merz.

The situation before the Court contrasts with that in *Bernabei v. St. Paul Fire & Marine Insurance. Co.*, 2005-Ohio-575, 2005 WL 351754 (Fed. 14, 2005). In *Bernabei*, Ohio's Fifth District Court of Appeals upheld a trial court's decision to deny enforcement of a settlement agreement purportedly entered into during mediation. *Id.* The plaintiff argued that she had verbally accepted the defendant's settlement offer during mediation, and presented an affidavit from her attorney swearing that verbal acceptance occurred during the mediation and in a telephone conversation after the session. *Id.* ¶ 18. However, her attestation was contradicted by a letter from her attorney, sent months after mediation, stating that she then accepted the defendant's offer, the scheduling of a second mediation months after the "acceptance" by the attorney, the lack of any "correspondence [] confirming, discussing, memorializing or referencing a settlement agreement or requesting payment," the lack of notification to the trial court of a settlement, and testimony from the mediator that the parties had not reached an agreement at the first mediation. *Id.* ¶¶ 20-24.

37

Here, in contrast, the mediation process conclusively terminated with Judge Merz's report, and the parties made no effort to enter another mediation session. Unlike in *Bernabei*, the volume of email between the parties after mediation discussed, memorialized, and referenced a settlement agreement, and included drafts of the agreement. The Court was notified of a settlement, and Judge Merz testified that an agreement had been reached. The evidence presented to the Court is a mirror image of the evidence considered in *Bernabei*, and therefore requires the opposite conclusion. Tocci's subsequent protestations, in spite of their volume and color, cannot overcome the ultimate conclusion that the parties reached a meeting of the minds during mediation.

### 2. The essential terms of the settlement agreement are certain and clear.

In addition to a meeting of the minds, an enforceable settlement agreement must have essential terms that are "reasonably certain and clear." *Rulli v. Fan Co.*, 442 N.E.2d 337, 339 (Ohio 1997). For example, where the parties do not dispute the total settlement sum and the proportion each defendant must pay, the terms are sufficiently certain and clear to overcome one defendant's argument that the settlement imposes joint and several liability, justifying enforcement of the agreement. *Kostelnik v. Helper*, 770 N.E.2d 58 (Ohio 2002) (reversing trial court's decision to overrule motion to enforce settlement). Conversely, a disagreement over which specific business activities are encompassed by a non-compete clause and whether the agreement releases all pending claims in the lawsuit renders terms

too unclear and uncertain for a court to enforce the agreement. *Riordan's Sporting Goods, Inc. v. Riordan's Sports & Equip., LLC*, No. 2002-T-0099, 2003-Ohio-3878, 2003 WL 21689860 (Ohio Ct. App. July 18, 2003) (reversing trial court's enforcement of settlement agreement).

Here, the parties emerged from mediation with terms that were sufficiently certain and clear for their settlement agreement to be enforced.  That fact was apparent from Judge Merz's ability to recall, after his memory was refreshed by the notes he took during the mediation, the essential terms that the parties agreed to at that time.  The parties do not appear to dispute the terms that the Court considers material, including Tocci's receipt of a settlement sum of $25,000, Tocci's agreement not to publish a book about Antioch, Tocci's receipt of the MACR degree after completing a one-quarter course for four additional credits, Antioch's revision of Tocci's academic record to include 14.5 additional credits, and Antioch agreeing to be bound by FERPA regarding Tocci's records.

What Tocci disputes, however, are the time and manner of performance of the settlement terms to which he and Antioch have otherwise agreed.  First, Tocci protests that Antioch "linked" payment of the settlement sum to his successful graduation.  Doc. #79-9.  The draft agreement sent to Tocci stated that "[u]pon successful completion by Tocci of the Capstone course, he will be entitled to receive $25,000 to be paid by or on behalf of Antioch."  Doc. #79-1 at 4.  Tocci, instead, believes that his agreement not to publish a book about Antioch should be conditioned upon his successful graduation, not Antioch's payment.  Tr. at 61.

However, the evidence shows that Tocci agreed to the condition as reflected in the draft of the settlement agreement prepared by Freeze. *See* Doc. #79-15, August 9, 2010, email from Duwel to Tocci (stating that Tocci "agreed to everything Steve put together" as drafted).

Tocci also insists that Antioch provide him a class syllabus, a class schedule, and access to a professor for the Capstone class *before* he signs the settlement agreement. He argues, in essence, that Antioch should commence performance of its obligations under the settlement agreement *before* he himself must be bound by the agreement or begin to perform. Tocci's argument is patently unreasonable. As Antioch points out, Tocci's position is essentially identical to the one taken by the plaintiff in *Henley v. Cuyahoga County Board of Mental Retardation and Developmental Disabilities*, 141 F. App'x 437 (6th Cir. 2005). The *Henley* plaintiff brought a bevy of discrimination and civil rights claims against her former employer, and then entered into mediation with a magistrate judge. *Id.* at 440. The settlement agreement provided for the employer's payment of $15,000 to the plaintiff in exchange for her early retirement. *Id.* After mediation, the district court entered an order of dismissal, and the defendant prepared the settlement documents. *Id.* However, the plaintiff refused to sign them. *Id.* at 441. Instead, she filed a motion to reopen the case, arguing that the defendant was attempting to materially alter the terms of the agreement, in part by making her signature of the settlement agreement a condition precedent to receiving the settlement sum from the defendant. *Id.* The plaintiff believed she

40

had "an absolute right" to "receive the . . . settlement proceeds within thirty days whether she executed the release of claims or not." *Id.* at 441, 444.

The Sixth Circuit agreed with the district court "that it was inconceivable that Henley and her attorneys would argue that Henley was entitled to receive payment of the settlement proceeds before executing a release of claims." *Id.* at 444. Specifically, the Sixth Circuit upheld the "determination that Henley's execution of a release of her claims was a constructive condition precedent to triggering a duty to pay settlement proceeds." *Id.* The court found support for its holding, in part, in the provision from the Restatement (Second) of Contracts stating that "[w]here all or part of the performances to be exchanged under an exchange of promises can be rendered simultaneously, they are to that extent due simultaneously, unless the language or the circumstances indicate the contrary." *Id.* (quoting Restatement (Second) of Contracts § 234 (1981)). No language or circumstances indicated that the parties were to not simultaneously perform their obligations, and, thus, by "imposing a constructive condition," the district court merely determined that the plaintiff "would not be entitled to the settlement proceeds until she executed the release." *Id.*

Tocci, like the *Henley* plaintiff, was not entitled to performance by Antioch until signing the settlement agreement. Tocci was not allowed to "re-enroll at Antioch as a student" or "act pursuant to and in accordance with the course requirements and perform the work" for the class, as the agreement described, before executing a release of his claims to Antioch. Doc. #79-6 at 4. Nor was he

41

entitled to be treated by Antioch "just as it would treat any other student participating in and taking such Capstone course" until signing the agreement. *Id.* Nevertheless, as early as three days after receiving the draft of the settlement agreement, Tocci urged Freeze to "[p]lease send me the written material on the Capstone so that I may start work now," while acknowledging that he had not yet signed the agreement. *See* Doc. #79-5, July 16, 2010, email from Tocci to Freeze. Tocci then demanded that Antioch treat him as an enrolled student in a Capstone course performance ("I want a syllabus and I want to talk to a professor. This is my right as a student") and threatened to notify the mediator if Antioch did not begin performing ("If I don't have a syllabus in hand by Thursday and speak to a Capstone agreement, I will write Judge Merz stating that you would not comply with the agreement in a timely fashion"). *Id.* Tocci even protested that Antioch was not performing in accordance with the agreement because he was not being "treated as any other student." Doc. #79-9 (July 24, 2010 email). Like the *Henley* defendant, Antioch was under no obligation to act as if Tocci was its student, or provide Tocci with course materials or access to a professor until he executed the settlement agreement.

Nor was Tocci entitled to a revised transcript reflecting 14.5 additional academic credits until he executed the settlement agreement. In an August 8, 2010, email to Freeze, Tocci asked "[i]f the credits are not linked to the Capstone and mediation was a month ago, where is the dated, revised transcript? This is a simple electronic correction. It [sh]ould have taken under 5 minutes." Again,

42

Tocci expected Antioch to already be performing its obligations under the agreement with no reciprocation on his part. As with the terms concerning the Capstone course, Tocci's execution of the settlement agreement was a condition precedent to Antioch's performance and fulfilling its obligations to Tocci. Tocci's expectation of immediate performance, rather than the clarity of the agreement's essential terms, was the problem.

### 3. An unexecuted settlement agreement is enforceable under Ohio law.

Finally, the Court must consider Tocci's argument that an unexecuted settlement agreement is unenforceable. Under Ohio law, this is simply not the case. While there is no doubt that "[i]t is preferable that a settlement be memorialized in writing," an oral settlement agreement is enforceable under Ohio law if "there is sufficient particularity to form a binding contract." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (citing *Pawlowski v. Pawlowski*, 615 N.E.2d 1071, 1074 (Ohio Ct. App. 1992) and *Spercel v. Sterling Indus., Inc.*, 285 N.E.2d 324, 326 (Ohio 1972)). Of course, the parties may agree that their agreement is enforceable only if reduced to writing and signed, but there must be "clear evidence" of such intent. *Richard A. Berjian, D. O., Inc. v. Ohio Bell Tel. Co.*, 375 N.E.2d 410, 413 (Ohio 1978) (stating that "it is well-established that courts will give effect to the manifest intent of the parties where there is clear evidence demonstrating that the parties did not intend to be bound by the terms of an agreement until formalized in a written document and signed by both").

43

For example, in *Owens v. Bailar*, No. 2008CA29, 2009-Ohio-2741, 2009 WL 1636135 (Ohio Ct. App. June 5, 2009), the Ohio Court of Appeals reversed a trial court's decision to enforce an unsigned settlement agreement. Before entering mediation, the parties filed a notice with the trial court stating that any agreement reached in mediation had to "be reduced to writing by the mediator, reviewed, approved and signed by all participants and their attorneys, and a copy submitted to the Court by the mediator." *Id.* at *2. One party refused to sign the mediator's report, and testified later that he refused because the report "did not embody the parties' agreement." *Id.* at *3. The court reasoned that it was reasonable for the refusing party to "take the terms of the notice he received to mean that he would not be bound by any agreement he made in mediation unless it was reduced to writing and signed by him." There was no meeting of the minds, and thus, no enforceable contract existed between the parties.

Here, there is no evidence that the parties entered mediation with a clear intent to only be bound if they emerged with a signed, written agreement. Unlike the parties in *Owens*, Tocci and Antioch never memorialized or indicated in any fashion that they intended only to be bound by a written agreement, much less with the necessary showing of "a clear intent." Consequently, Tocci's refusal to sign the settlement agreement is not evidence of the parties' failure to reach a meeting of the minds.

Finally, Tocci has also argued that his First Amendment rights would be violated by enforcement of the provision in the settlement agreement that would

44

prevent him from publishing a book about Antioch. The *Henley* plaintiff also argued that such a violation would occur if a confidentiality clause in her agreement were enforced. The Sixth Circuit rejected that argument because the plaintiff did not "voluntarily relinquish[] any First Amendment rights other than those specifically related to the parties' particular dispute, and . . . this term was part of the parties' bargain to resolve the case." Henley, 141 F. App'x at 445-46. The same logic applies here. The provision of the settlement agreement in question only concerns Tocci's dispute with Antioch, and it was agreed to by Tocci during mediation.

The Court concludes that the parties did reach an agreement, and its essential terms were clear. The Court, therefore, ORDERS the enforcement of the settlement agreement, as memorialized in Freeze's second draft, the attachment to the July 16, 2010, email from Freeze to Tocci. Doc. #79-6.

## III.    **MOTION FOR ATTORNEY'S FEES**

Antioch has also requested that the Court impose attorneys' fees and costs on Tocci related to the enforcement of the settlement agreement. Doc. #50 at 17-20. Antioch believes that both Tocci's "refus[al] to consummate the settlement agreement" and his "repeated threats toward Antioch and defense counsel, as well as his own former attorney" justify the imposition of sanctions. *Id.* at 17.

Normally, the well-established "American Rule" requires parties to bear the burden of paying their own attorney fees in litigation. *See Alyeska Pipeline Serv.*

*Co. v. Wilderness Soc.*, 421 U.S. 240 (1975) (describing historical evolution and justification for American rule). The American Rule does not apply when a rule or statute expressly authorizes the imposition of attorneys' fees. *See*, *e.g.*, Fed. R. Civ. P. 11(c)(4) (authorizing the payment "of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation" of Rule 11); 28 U.S.C. § 1927 (authorizing the imposition of "excess costs, expenses, and attorneys' fees" on an attorney who "multiplies the proceedings in any case unreasonably and vexatiously"). In addition, a district court may invoke its inherent powers to impose attorney fees upon a party that acts "in bad faith, vexatiously, wantonly, or for oppressive reasons" during litigation. *Alyeska Pipeline*, 421 U.S. at 258-59 (citations and quotations omitted). Thus, through its inherent powers, "the district court has supervisory power to regulate the conduct of attorneys and parties before it, which may include awarding attorney fees." *Jaynes v. Austen*, 20 F. App'x 421 (6th Cir. 2001) (citing *United States v. Payner*, 447 U.S. 727 (1980) and *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)).

The attempt to repudiate or alter the terms of an agreement after settlement may justify an award of attorneys' fees to the party who, as a result, expends subsequent resources to enforce or defend the agreement. *Id*. In *Jaynes v. Austin*, for example, employees settled their wrongful termination claims with their employer after a day of mediation. *Id.* However, the employer subsequently sent forms to the employees with "new terms not present in [the agreement] nor bargained for," such as required withdrawl from the employer's profit sharing plan

46

and the release of claims not previously discussed.  *Id.* at 423.  The Sixth Circuit

upheld the district court's decision to award attorneys' fees for the work

performed to address to the new terms, as well as those "additional legal expenses

incurred in responding to the defendant's continuing effort to delay and obstruct

final resolution of this action."  *Id.* at 427.  In such conduct, the Sixth Circuit

recognized a proper "finding of bad faith conduct to justify an award of attorney

fees."  *Id.*; *see also McManus v. St. Joseph Hosp. Corp.*, 79 F. App'x. 170 (6th

Cir. 2003) (affirming district court's award of attorneys' fees incurred by

defendant in responding to motion to set aside settlement agreement filed by *pro*

*se* plaintiff); *Hoey v. Sunrise Senior Living Mgmt, Inc.*, No. 11–CV–13740, 2013

WL 773014 (E.D. Mich. Feb. 28, 2013) (awarding a plaintiff costs and fees

incurred in "bringing and defending [a] motion" to enforce a settlement agreement

after the defendant sought to add "material changes to an agreement that ha[d]

already been reached by the parties," and admonishing the defendant for taking

the post-settlement period for memorializing the agreement "as opportunity to

change the essential terms of the settlement").

On the other hand, a party seeking enforcement of a settlement agreement

is not entitled to attorneys' fees simply because the parties disagree over whether

a settlement occurred.  After all, bad faith cannot underlie every disagreement over

the actual terms of a settlement.  In *McCormick v. Brzezinski*, No. 08-10075,

2010 WL 1463176 (E.D. Mich. Apr. 13, 2010), for example, the court enforced a

settlement agreement where the parties disputed the terms, but refused to award

47

attorneys' fees to the defendant. The court recognized that the plaintiff "suffer[ed] from 'buyer's remorse' regarding the terms she agreed to during the settlement conference," but, emphasizing her *pro se* status, found "little evidence that her conduct support[ed] a finding of actual bad faith conduct or conduct tantamount to bad faith." *Id.* at *6.

Here, Tocci's actions do not comport with mere buyer's remorse. Regrettably, the Court concludes that Tocci's repudiation of the settlement agreement, his post-settlement attempts to impose new terms on Antioch, and the threats, insults, and intransigence that delayed the termination of this litigation demonstrate a degree of vexatious, bad faith conduct that entitles Antioch to an award of attorneys' fees and costs. The Court agrees with Antioch, and locates the origin of this conduct in Tocci's July 18, 2010, email demanding the inclusion or alteration of the terms of the settlement, including: a requirement that the parties blame the "unfortunate mishap" of the litigation on "a computer malfunction/virus;" a 5 day deadline for the provision of his transcript and a 7 day deadline for payment of the settlement; that Antioch allow Tocci to complete the Capstone course at an accelerated pace; and demanding a certificate, "suitable for framing," from Antioch's Chancellor attesting to Tocci's mediation skills.

Tocci's subsequent demands that Antioch immediately begin to perform by providing him with course materials and access to a professor are not, in and of themselves, bad faith conduct. After all, demands are demands, both in litigation and mediation. However, once Tocci coupled them with the assumption that he

48

would not have to reciprocate performance (even proposing to delay *any* release of his claims until Antioch's *complete* performance), such demands begin to factor into the calculus of bad faith.  Furthermore, Tocci's accusations of theft, extortion, and conspiracy, along with the puerile insults ("Larry, Moe, & Curly," "evil woman") directed at Antioch's representatives all demonstrate a disregard for basic civility, further poisoning the dynamic between the parties and prolonging the litigation.

The Court wishes to emphasize, in particular, Tocci's repeated threats to write, with a possibly defamatory animus, a book that made his "case" against Antioch and placed the "sterling reputations" of Freeze and Duwel "in the toilet." Doc. #79-16.  Tocci first brought the idea up during mediation, then repeatedly threatened to write the book in an apparent attempt to gain leverage.  By the time his discourse had degenerated into insults and other threats, Tocci was also threatening to write such a book if he did not receive $50,000.  Bearing in mind that, under Ohio law, it is a felony of the third degree, extortion, "to damage any person's personal or business repute, or to impair any person's credit" with the purpose of obtaining "any valuable thing or valuable benefit," such statements are reprehensible, and cannot be countenanced.  Ohio Rev. Code §2905.11.

Finally, it must be noted that counsel for Antioch displayed an exemplary, an extraordinary degree of patience with Tocci before ultimately filing the Motion to Enforce.  Freeze offered to discuss eliminating the requirement of graduation from the payment of the settlement sum with Antioch.  He also offered to arrange for

49

course materials and a conversation with a professor upon execution of the agreement, and assured Tocci of Antioch's willingness to let Tocci start the course late, as the academic quarter had already begun.  Furthermore, Judge Merz stated that Antioch's counsel brought course materials for the Capstone course to the mediation proceedings, which were also emailed to Tocci.  These overtures simply put Tocci's intransigence into further relief.  Accordingly, the Court concludes that, under its inherent powers, Antioch is entitled to attorney fees and costs for the work performed by its attorneys in response to Tocci's bad faith conduct.

"A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees" as a sanction. *Chambers*, 501 U.S. at 50.  On August 22, 2012, the Court overruled Tocci's motion to unseal certain documents, namely, the fee statements of Antioch's attorneys.  Doc. #90. The Court promised Tocci that, in the event it ruled in Antioch's favor on the issue of attorneys' fees and costs, it would allow Tocci to renew his motion to unseal the fee statements.  *Id.*  The Court will not require Tocci to renew his motion, but instead ORDERS the fee statements to be unsealed upon Antioch's filing of a supplemental memorandum addressing attorneys' fees.  Because the fee statements are crucial to the determination of the amount Antioch is entitled to, and Tocci must be afforded notice and the opportunity to respond in accordance with *Chambers*, the Court will not quantify the amount of attorneys' fees and costs at this time.

Furthermore, during the evidentiary hearing, the Court stated that it would direct Antioch to file a supplement to the Motion to Enforce addressing the quantification of fees, in the event that the Court ruled in its favor on this issue. Accordingly, Antioch is directed to do so pursuant to the Court's order below, and Tocci will be provided the opportunity to respond accordingly.

## IV.    **CONCLUSION**

For the reasons set forth above, the Court SUSTAINS Antioch's Motion to Enforce the Settlement Agreement and Motion for Sanctions including Attorneys' Fees and Costs (DOC. #50).  Accordingly, the Court OVERRULES Tocci's Motion for Reconsideration (Doc. #91), requesting that the Court strike the parties' mediation, as moot.

The Court ORDERS the parties to perform in accordance with the settlement agreement, as memorialized in the attachment to the July 16, 2010, email from Freeze to Tocci.  Doc. #79-6.

Furthermore, Antioch is ORDERED to file a supplemental memorandum, within thirty (30) days, quantifying the attorney fees and costs that it incurred after July 18, 2010, in connection with the enforcement of the settlement agreement.  From the date of the filing of Antioch's supplemental memorandum, Tocci will be provided with thirty (30) days to respond.  Antioch will then have ten (10) days to file any reply memorandum deemed necessary.

Finally, the Court ORDERS, upon the filing of Antioch's supplemental memorandum quantifying attorneys' fees, that certain previously sealed documents (Doc. #80) be unsealed, in accordance with Tocci's previous request (Doc. #84), thereby providing Tocci with the documents necessary to respond to Antioch's supplemental memorandum.


Date: August 26, 2013

WALTER H. RICE
UNITED STATES DISTRICT JUDGE